GEORGE P. BILYEU, JR., AND MARTHA F. BILYEU, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bilyeu v. Commissioner
Docket No. 31514-86.
United States Tax Court
T.C. Memo 1988-209; 1988 Tax Ct. Memo LEXIS 234; 55 T.C.M. (CCH) 836; T.C.M. (RIA) 88209; May 10, 1988. *234 Petitioner, in investing in a master video recording shelter, relied upon its promoters for advice concerning the tax consequences of his investment. None of the promoters were certified public accountants or attorneys with tax expertise although they were represented to petitioner as such. Petitioner later conceded all issues except the addition to tax for negligence. Sec. 6653(a). Held, petitioner's reliance upon the promoters' advice was not reasonable, and petitioner is liable for an addition to tax for negligence pursuant to section 6653(a). Joseph V. Crockett, III, for the petitioners. Stephen C. Coen, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By statutory notice dated April 30, 1986, respondent determined deficiencies *235 in addition to petitioners' [1] Federal income taxes for the years and in the amounts as follows: Additions to Tax
Income
Section [2]
Section
Section
Section
Year
Tax
6653(a)
6653(a)(1)
6653(a)(1)
6659
1977
$  3,110.00
$   220.70
1978
5,654.75
354.42
1979
4,806.44
240.32
1980
32,451.27
1,622.56
1982
4,204.65
$ 210.23
50% of interest
$ 1,261.39
due on $ 4,204.65
1983
5,399.00
269.95
50% of interest
due on $ 5,399.00
1,298.40
Respondent also determined that petitioners were liable for increased interest under section 6621(c), formerly 6621(d). After concessions the sole remaining issue is whether petitioner is liable for an addition to tax for negligence pursuant to section 6653(a). FINDINGS OF FACT
*236 Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners were residents of Brentwood, Tennessee. The parties stipulated that petitioner invested in the same master video recording program that is the subject of our opinion in . Pursuant to that stipulation we incorporate by reference only so much of that opinion's Findings of Fact as concern the actual mechanics of the DanKryst master video recording program. Petitioner was first introduced to the DanKryst program in the late fall of 1980 at a 3-day retreat sponsored by Jesus is Lord Ministries (JLM). [3] After one of the services, petitioner was approached by Charles Thompson (Thompson), President of JLM, whom he had earlier met at a meeting of the Full Gospel Businessman's Fellowship [4] in Nashville in 1977. Petitioners became close personal friends of the Thompsons, attending several tent revivals in the years following 1977 and contributing heavily to JLM. Also at one of JLM's tent crusades, petitioner met Daniel Chester, a retired *237 businessman who, by the time they met, was Associate Director of and devoted his full time to JLM. Petitioners also became close friends of the Chesters. At Thompson's request, petitioner attended a meeting with 25 to 30 others at which Daniel Chester described the DanKryst program. At that meeting, petitioner was introduced to C. P. Christian (Christian), who was represented to him as an attorney from Arkansas specializing in tax matters. Also at that meeting, petitioner met Gary Chester, Daniel Chester's son, who was represented to petitioner by Daniel Chester as a certified public accountant proficient in tax matters. It was not until long after petitioner had invested in DanKryst that he learned that Christian was in fact a criminal attorney from Jacksonville, Florida, and that Gary Chester was a high school graduate with 1 year of college and some tax return preparation experience. Later in *238 the meeting, petitioner and the others were introduced to John Williams (Williams) who told those gathered that he had been involved in the formation of tax shelters in California before having a religious experience and starting to operate in Arizona. It was also at this meeting that petitioner met Ron Davis (Davis), who was to set up a corporation called SWEET, Inc. (SWEET), to handle the nationwide distribution of the tapes. This distribution was to be to low-wattage television stations and through various churches and other Christian organizations. Davis told those present at the meeting that they could expect to profit from their investment in 3 to 5 years. Until each investor's note was satisfied it was arranged that 50 percent of all receipts were to go to SWEET for buying and operating video equipment and 50 percent to DanKryst. Although investors bought individual tapes, revenues from all tapes were pooled to avoid investor concern over which tape to buy. Gary Chester sent out regular correspondence to DanKryst's investors, including petitioner, which for the first 2 or 3 years represented that the program was proceeding according to plan. Gary Chester also filled *239 out petitioner's Schedule C for 1980, 1982, and 1983. The remainder of petitioner's Federal income tax returns for those years were prepared by Gordon Gill (Gill), petitioner's regular certified public accountant. Petitioner had spoken to Gill about DanKryst, and was warned to use caution, as the Internal Revenue Service (IRS) was questioning such investments. However, Gill had no objection to the plan after he was told by petitioner that IRS approval had been received. Petitioner's belief that the plan had been approved by the IRS was a result of Daniel Chester's representation to him concerning a meeting between IRS officials and JLM representatives in Little Rock. Petitioner was assured by Daniel Chester that the DanKryst program had been fully explained to the IRS and had been given approval, when in reality there had only been a 20-minute meeting between those parties and no details of the plan were discussed. Petitioner purchased two tapes at a purchase price of $ 100,000 each. Petitioner executed a note for $ 200,000, which he continued to hold after signing. Petitioner held the note since the promoters of the DanKryst program held on to the tapes. Although the promoters *240 represented to petitioner that the tapes would be kept in an environmentally controlled room, they were in fact dept in a footlocker in Davis' attic. Because petitioner assumed that the tapes were in a safe place, he procured no insurance on them despite their alleged value of $ 100,000 each. To participate in the DanKryst program petitioner was required to make a cash investment of 10 percent of the total cost of the tapes purchased. In order to come up with this sum, petitioner furnished copies of his 1977 through 1979 tax returns to the DanKryst promoters who, after examination, told him that he could receive an investment tax credit carryback of over $ 19,000 as a result of his investment in DanKryst. In the form of a tax refund for those years, such carryback would provide the necessary cash for investment in the program. The number of tapes petitioner could purchase was determined to a great extent by how much cash petitioner could assemble to make a 10-percent deposit. Neither petitioner nor any of the other investors in DanKryst had any experience in the videotape industry. Petitioner never viewed the master recordings and never actually saw the tapes themselves. He *241 never had the tapes appraised nor was he made aware of any appraisal; he never personally contacted the IRS, never checked with any of Williams' former investors, never asked Williams for a reference, and never asked for or obtained any information about Christian. Petitioner never received any information regarding the DanKryst program from anyone other than a DanKryst promoter. The only financial projections that he ever saw were made by Davis, and he was unaware of the number of tapes that must be sold for the program to break even. Petitioner's monitoring of his investment consisted of receiving an occasional phone call and his yearly financial statement. Petitioner was under the impression that Williams was the only person that had ever previously been involved in a similar venture. Petitioner never saw a tax opinion from an attorney regarding the shelter, [5] and did not ask Gill for an opinion. Rather, petitioner trusted the promoters based upon their affirmations of faith and representations that they were all born-again Christians. Petitioner has not attempted to recover his cash investments since correspondence he has received from DanKryst indicates that it is bankrupt. *242 OPINION Negligence in the context of section 6653(a) has been defined as a "lack of due care or failure to do what a reasonable or ordinarily prudent person would do under the circumstances." . Reliance upon the advice of experts constitutes a defense to the addition to tax for negligence. ; . See also . We have held this to be the case even though the advice relied upon was erroneous. , affd. . However, that reliance must be reasonable, and a blind reliance upon the advice of a purported *243 expert will not constitute a defense. In order for that reliance to be reasonable, it must extend beyond the subject matter of the advice; the taxpayer seeking to utilize the defense must also show that his reliance upon the purported expert's ability is reasonable. We think petitioner's actions or lack thereof are similar to those of the taxpayers in . Petitioner made a $ 200,000 "investment" financed in large part through a recourse note. However, petitioner retained possession of the note, explaining that DanKryst promoters retained possession of the video tape. While retaining possession of this note relieved petitioner of a great deal of risk of economic loss (since he could destroy the note), he was under no less duty to investigate the tax consequences of his investment. On cross examination, petitioner revealed the very limited extent to which he investigated or sough advice concerning DanKryst. Even to the extent petitioner did seek advice, he received it only from DanKryst promoters and officers and agents of JLM. The only legal opinion concerning DanKryst of which petitioner may have been aware was the *244 verbal opinion given by Christian. [6] While petitioner was under the impression that both Christian and Gary Chester were qualified tax professionals, these impressions were created by persons interested in petitioner making an investment in DanKryst. These persons also represented to petitioner that the IRS had approved the investment. However, even though petitioner testified that he would not have made his investment had he known that the IRS had refused to give written approval to the DanKryst program, he never asked for proof of any such approval. Moreover, petitioner relied on these persons despite the fact that he had been warned of such investments *245 by his certified public accountant, Gordon Gill. We think that Gill's warning concerning IRS scrutiny of such investments would have been incentive enough for a reasonably prudent person to seek outside advice concerning the DanKryst program. [7]
We found in , that the taxpayers therein did not seek advice from persons independent of the DanKryst plan promoters. Such a fact weighed heavily in favor of our decision to impose an addition to tax pursuant to section 6653(a). Likewise, we held in , that the taxpayers therein were not entitled to rely on the advice of an attorney employed by a family trust promoter as a defense to section 6653(a). Petitioner's conduct in failing to *246 seek independent advice is of the same nature. Accordingly, Decision will be entered for the respondent.
Footnotes
1. Martha F. Bilyeu is a petitioner herein solely by virtue of having s signed a joint return with her husband. All references to petitioner individually refer to George P. Bilyeu. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. JLM conducted tent crusades from May through October in several southeastern states. It held 3-day retreats twice a year which were attended by as many as 1,000 persons. ↩
4. The Full Gospel Businessman' Fellowship is an interdenominational group of Christian businessmen. ↩
5. In , we found as a fact that Christian gave a verbal legal opinion approving the DanKryst program. However, petitioner could not recall whether he received any correspondence in the form of an opinion or otherwise from Christian. ↩
6. It cannot be determined on this record if Christian's opinion was given to petitioner directly or relayed to him by any one of those persons associated with DanKryst. As we found in , "Gary [Chester] testified that a verbal legal opinion approving JLM's plan was later obtained from C. P. Christian * * *, an attorney from Jacksonville, Florida, who specialized in criminal law." , 55 P-H Memo T.C. par. 86,355. ↩
7. Gill approved of petitioner's investment after petitioner informed him that the program had been approved by the IRS. However, as we have found, no such approval had been given. Reliance on the advice of an expert is not a defense to section 6653(a) if that expert is not supplied with all the pertinent facts by the taxpayer. . ↩